# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### November 18, 2003 Session

## STATE OF TENNESSEE v. DAVID K. WACHTEL, III

### Direct Appeal from the Criminal Court for Sumner County
### No. CR905-2001     Jane W. Wheatcraft, Judge

_____

### No. M2003-00505-CCA-R3-CD - Filed April 13, 2004

_____

The appellant, David K. Wachtel, III, was convicted in the Sumner County Criminal Court of three counts of domestic assault. The trial court imposed a sentence of eleven months and twenty-nine days incarceration in the Sumner County Jail for each conviction, with one sentence consecutive to the other two, and placed the appellant on probation. On appeal, the appellant raises issues concerning the trial court's rulings, the sufficiency of the evidence supporting his convictions, and sentencing. Upon our review of the record and the parties' briefs, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and THOMAS T. WOODALL, J., joined.

Joshua G. Strickland, Nashville, Tennessee, for the appellant, David K. Wachtel, III.

Paul G. Summers, Attorney General and Reporter; Elizabeth T. Ryan, Assistant Attorney General; Lawrence Ray Whitley, District Attorney General; and Cara Harr and Joe James, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

In November 2001, the Sumner County Grand Jury indicted the appellant on three charges of domestic assault. Count one related to the appellant's assault of his mother, Sheron Wachtel; count two related to his assault of Amber Wachtel, his then wife; and count three related to his assault of his father, David K. Wachtel, II.

At trial, Deputy Jackson Taylor of the Sumner County Sheriff's Department testified that on the night of September 28, 2001, he was dispatched to an address on Long Hollow Pike. Deputy Taylor arrived at the location around 9:00 p.m. and noticed the appellant sitting on the side of the road

approximately 1000 or 1500 yards from the residence. The appellant was wearing a camouflage "hunting outfit" and had a pair of brown boots. Deputy Taylor could not remember if the appellant was wearing the boots or simply had them in his possession. The appellant was "cooperative" and "a little upset." Deputy Taylor acknowledged that he did not question the appellant about that night's events, relying instead on the information "volunteered" by the appellant. He explained that he refrained from questioning the appellant because he was trying to avoid "conflicting stories."

When Deputy Taylor approached the appellant he saw that the appellant was holding his head. The appellant told Deputy Taylor that he thought his father had shot him. The appellant had blood on his head and his hand. Deputy Taylor observed a two-inch laceration to the top of the appellant's scalp. However, Deputy Taylor opined that the appellant's wound appeared to have resulted from the appellant being struck with something, not from a gunshot.

After determining that the appellant's wound required treatment, Deputy Taylor called an ambulance to the scene. When the ambulance arrived, the appellant refused treatment. Therefore, Deputy Taylor drove the appellant to the hospital. Deputy Taylor explained, "That is the standard procedure. The jail will not take him if he is injured, and he had a head wound." Deputy Taylor stayed at the hospital with the appellant until Deputy Kerry Golob arrived, then Deputy Taylor left.

Captain Don Badacour of the Sumner County Sheriff's Department also testified at trial. Captain Badacour testified that he was on duty the night of September 28, 2001, when he heard that an officer had been dispatched to the address on Long Hollow Pike. Captain Badacour proceeded to the residence "due to the nature of the call" and because he was close to the location. Upon his arrival, he observed Deputy Taylor detaining the appellant some distance from the residence. Deputy Taylor explained to Captain Badacour that "a domestic had happened inside the house and that this young man was supposed to be a victim." Deputy Taylor stated that the other parties were still in the house. Deputy Golob arrived shortly thereafter and the two officers drove to the house. Captain Badacour stated that he never spoke with the appellant.

Because of reports of gunfire, Captain Badacour and Deputy Golob drove toward the house with the lights on their vehicles turned off. The officers parked "a safe distance" from the residence, and Captain Badacour used his "PA system" to instruct David Wachtel, the appellant's father, to come out of the house onto the front porch. Captain Badacour testified that he knew Mr. Wachtel because he had attended high school with him. Nonetheless, Captain Badacour had his gun drawn, and Deputy Golob was stationed at the end of his vehicle with his shotgun out. Mr. Wachtel immediately complied with Captain Badacour's instructions to come out of the house.

Initially, Mr. Wachtel resisted Captain Badacour's request to hold his hands and his coat up to demonstrate that he did not possess a weapon. Ultimately, he allowed Captain Badacour to "pat down" his clothes to ascertain that he was unarmed. Mr. Wachtel stated that he did not have a weapon and had not had a weapon earlier that night. Captain Badacour and Deputy Golob then accompanied Mr. Wachtel into the house. Captain Badacour noted that Mr. Wachtel "had a bruise – redness to the upper part of his face on his right-hand side."

Inside the residence, Sheron Wachtel, the appellant's mother, was sitting on a couch in the downstairs living room. On Mrs. Wachtel's arm, Captain Badacour observed what "[l]ooked like possible fingernails scratched across her skin." After searching for weapons in the immediate vicinity, Captain Badacour instructed Mr. Wachtel, appellant's father, to sit in a chair near the couch. While Deputy Golob spoke with Mr. and Mrs. Wachtel, the appellant's parents, Captain Badacour obtained a flashlight and searched outside the house for a weapon or signs of blood. He discovered neither. Captain Badacour went back into the house and smelled Mr. Wachtel's hands for gunpowder residue but detected none. He also did not smell soap indicative of a recent hand-washing.

Captain Badacour then spoke with Mr. and Mrs. Wachtel. Mrs. Wachtel stated that the appellant's estranged wife, Amber, was staying with the Wachtels because she and the appellant were in the process of obtaining a divorce. Amber was afraid of the appellant due to previous incidents of domestic violence. That evening, the appellant had come to the house to visit the child, Taylor. The appellant held the child and stated that he wanted to take her away from the house. Mrs. Wachtel called the appellant's father and asked him to come home from work. He arrived thirty to forty minutes later. Mr. Wachtel took the child from the appellant and gave her to Amber. The appellant and his father began arguing, then the argument turned physical. Mr. Wachtel was on the floor and the appellant was choking him. In order to get the appellant off of his father, Mrs. Wachtel hit the appellant on the back of the head with a tray from the child's high chair. Mr. Wachtel told Captain Badacour that the appellant was "just unreasonable" and that he was attempting to get the appellant to leave the house.

Thereafter, Captain Badacour spoke with Amber Wachtel, who had been upstairs with her child during his conversation with the appellant's parents. She was visibly upset and had been crying. Even though Amber had been separated from the Wachtels, her statement was "consistent" with their version of the events. Captain Badacour testified that while speaking with Amber, he observed scratches on her arm. She stated that the appellant grabbed and twisted her arm when she tried to get the child from him. Based upon the statements of David, Sheron, and Amber Wachtel, Captain Badacour determined that the appellant was the "primary aggressor." Therefore, he ordered that the appellant be taken into custody and charged with domestic assault.

Captain Badacour acknowledged that he saw the tray Mrs. Wachtel had used to strike the appellant. Captain Badacour examined the tray for blood or hair but found neither. He also did not see any blood in the kitchen.

Captain Badacour admitted that he did not interview the appellant, explaining that he was acting as a "back-up" investigator, and Deputy Golob was the lead investigator on the case. Captain Badacour noted that David, Sheron, and Amber Wachtel denied that a gun was used during the altercation.

Deputy Kerry Golob of the Sumner County Sheriff's Department testified that he arrived at the scene of the offenses at 8:54 p.m. on September 28, 2001, only a few minutes after being dispatched to the residence. Deputy Taylor and Captain Badacour were already at the location when he arrived.

Deputy Golob and Captain Badacour drove toward the house with the lights on their vehicles turned off because of a report that someone at the residence had a weapon.

Upon reaching the house, Deputy Golob drew his weapon while Captain Badacour used the "PA system" to order Mr. Wachtel to come outside the house. After the officers determined that Mr. Wachtel did not have a weapon, they followed him into the house. The officers never found a weapon at the residence.

Deputy Golob testified that he interviewed Sheron and David Wachtel simultaneously, but Amber Wachtel was interviewed separately. Nevertheless, their accounts of the events were "consistent." Amber "described [that the appellant] grabbed her arm when she tried to grab the child and twisted it and put her to her knees." Mrs. Wachtel received a scratch on her arms when the appellant grabbed her as she attempted to prevent him from removing the child from the residence. After the altercation, the appellant remained at the residence. When Mr. Wachtel arrived, he "asked his son to leave. They got verbal then they got physical." As a result of the altercation, Mr. Wachtel had bruises on his head. Based upon the consistent statements of Amber, David, and Sheron Wachtel, Deputy Golob opined that the appellant was the "primary aggressor," and he decided to arrest the appellant for three counts of domestic assault.

On cross-examination, Deputy Golob testified that he saw a truck parked behind the residence, and the tires on the driver's side of the truck were flat. Deputy Golob learned that the truck belonged to Mr. Wachtel's company. However, the appellant had driven it to the residence that evening. It was ascertained that after the altercation, Mr. Wachtel let the air out of the tires to prevent the appellant from taking the truck. Deputy Golob discovered that the appellant had been driving the truck when he asked officers to retrieve his shoes and wallet from the vehicle.

Deputy Golob acknowledged that he never interviewed the appellant. He based the arrest of the appellant upon the three consistent statements of the victims. Deputy Golob maintained that nothing the appellant could have said during an interview would have changed his mind about the appellant's guilt of domestic assault.

Additionally, Deputy Golob admitted that in an "affidavit of complaint" the appellant's father admitted that he had kicked his son. Deputy Golob asserted that this statement did not change his assessment that the appellant was the "primary aggressor." Deputy Golob surmised that the appellant could have simply abandoned the encounter and left the premises.

Additionally, Deputy Golob observed that in the "affidavit of complaint" prepared for Mrs. Wachtel, he had stated, "Sheron Wachtel and [the appellant] got into a physical altercation that left marks on both parties." Deputy Golob testified that "'both parties' referred to the appellants' mother and wife, not the appellant.

-4-

Finally, Deputy Golob noted that the appellant had been taken to the hospital for treatment of a laceration to his head. Deputy Golob did not observe any blood on the appellant's clothing when he saw the appellant at the hospital.

Deputy Robert Jennings of the Sumner County Sheriff's Department was the last officer at the scene on the night of September 28, 2001. Upon his arrival, Deputy Jennings noticed Deputy Taylor and the appellant standing at the rear of a paramedic unit. Deputy Jennings proceeded into the residence, and Captain Badacour instructed him to interview Amber Wachtel. Deputy Jennings noted that Amber "was very, very emotionally upset, distraught. She was crying, basically shaken up."

Amber told Deputy Jennings that the appellant came to the residence to visit the child. During the visit, the appellant and his mother began arguing about the divorce. The appellant, who was holding the child, threatened to take her and leave. Whereupon, Amber reached for the child and the appellant grabbed Amber's arm and twisted it. During the altercation, Mr. Wachtel came home. He took the child from the appellant and returned her to Amber. Amber went into a separate room, and, shortly thereafter, heard a "commotion" and "fighting" in the other room. When she went to investigate the sounds, she saw that the appellant had his father on the floor and was choking him.

The first victim to testify at trial was Amber Wachtel.[1] Amber stated that she and the appellant separated on March 2, 2001, and the appellant filed for divorce in July 2001. However, they were still married on September 28, 2001. Amber related that her daughter, Taylor, was nine months old at the time of the offenses, and the appellant had made "sporadic" visits with the child. Amber was living with the Wachtels because she was fearful of the appellant's erratic behavior.

On September 28, 2001, the appellant made an unscheduled visit to his parents' home to visit Taylor. Amber was in the living room playing with Taylor when the appellant walked in, picked up the child, and sat in a rocking chair. Shortly thereafter, the appellant's mother walked into the room.

The appellant and his mother began a "pretty heated" discussion regarding the divorce and the appellant's demand for paternity testing. During the conversation, the appellant stated, "I'll take Taylor tonight." Amber attempted to take the child from the appellant. As she did, the appellant twisted her arm. She explained:

> He twisted [my arm]. I just remember being on the floor, not being able
> to move. He put me in a position where I could not get back to her
> anymore. . . . I just remember being twisted to the point where it was
> behind my back, and it kind of threw me on my knees. I got on my knees
> so it wouldn't hurt as badly, I guess.

---

[1] The appellant and Amber were divorced at the time of trial and she had resumed the use of her maiden name, "Amber Lee Wharton."

When the appellant released Amber, she walked back to the doorway of the living room to prevent the appellant from leaving with Taylor. Amber stated that she did not attempt to take Taylor from the appellant "[b]ecause I could forsee him getting really angry after he twisted my arm, that it was going to get bad. So I backed off."

After the appellant twisted Amber's arm, Mrs. Wachtel rose from the couch and attempted to take Taylor from the appellant. The appellant "swatted at her and scratched her arm or something." Mrs. Wachtel abandoned her efforts to get Taylor and left the room to call Mr. Wachtel and ask him to come home from work. After the call, Mrs. Wachtel returned to the living room.

Amber stated that Mr. Wachtel arrived home fifteen to twenty minutes later. He came into the living room and "asked what was going on, and we told him. That's when [Mr. Wachtel] told [the appellant] that he needed to get his butt out of the chair and leave the house." Specifically, the appellant's father warned the appellant that "he needed to get his ass out of the chair because he was just a silver-spoon spoiled brat." The appellant stood up and complied with his father's instruction to give Taylor to him. The appellant "was taking his time getting out of the living room." Accordingly, his father repeatedly ordered the appellant to leave the house and "kind of scooted him along with his foot. Just kind of pushed . . . [o]n his butt, the rear." At that point, the appellant "turned around and started swinging at his father. He had a closed fist." After the altercation, Mr. Wachtel had a black eye, but Amber was unsure of when the injury occurred.

During the altercation, Amber called 911 and requested assistance. However, the altercation between the appellant and his father ended, and the appellant started out of the house. Mr. Wachtel followed the appellant to make sure that he left. Amber told the 911 operator that everything was "okay" because the appellant was leaving.

Amber asserted that neither she nor the appellant's mother ever "hit, smack[ed], or punch[ed]" the appellant. Neither woman threatened the appellant with physical harm.

Sheron Wachtel also testified at trial. Mrs. Wachtel testified that at the time of the offenses, Amber had been living with her and her husband for four or five months, explaining, "We . . . took her in when she was not treated properly [by the appellant] in her house."

On September 28, 2001, the appellant arrived at the residence for an unscheduled visit with Taylor. The appellant, Amber, Taylor, and Mrs. Wachtel were in the den when Mrs. Wachtel began a conversation with the appellant. Mrs. Wachtel related that "the conversation was about the fact that his attorney had required a paternity test with the divorce proceedings. I was very upset about it." The appellant maintained that the test was merely standard procedure and he believed the child was his.

As the conversation continued, Mrs. Wachtel and the appellant began to raise their voices. The appellant, who was holding the child, stated that he would take Taylor that night. Amber and Mrs. Wachtel feared that the appellant would "kidnap" Taylor. Accordingly, Amber approached the appellant and asked him to give Taylor to her. The appellant refused. When Amber reached for Taylor, the

-6-

appellant grabbed Amber's arm and twisted it behind her back until she dropped to her knees. Amber "made a sound of pain." Mrs. Wachtel then "came after" the appellant. Mrs. Wachtel believed that he released Amber in order to "stop me from coming near him. . . . He tried to slap his hands at my arms to keep them away from him." The slaps "caused some scratches and bruises." Mrs. Wachtel stated that "[a]t some point during the scuffling I lunged toward his face and his glasses. I was able to get his glasses off, and that was just part of the scuffle." During these events, the appellant was holding Taylor.

Mrs. Wachtel determined that she needed to call Mr. Wachtel for assistance. She did not want to call the police because she "didn't want to admit that it was that bad." In response to her request, Mr. Wachtel came home. He walked into the den and asked what happened. Mrs. Wachtel testified:

> He was calm until he got the message that my son had touched me and had touched his wife . . . and he twisted her arm and made contact with me. And he didn't take it too lightly at all.
>
> . . . .
>
> My husband told [the appellant] to give him the baby, which he did. And [Mr. Wachtel] told him at that point, being that he had touched a female, which was very, very much against his belief, that he needed to get himself out and not to come back until he had grown up and taken responsibility. . . . He was saying things about him being spoiled and a silver-spoon child, those sorts of things.

The appellant was on his way out the door when his father, "brought his foot up and gave him just a little shove [on his buttocks] out the door." The appellant turned around and began "swinging" at his father. The appellant and Mr. Wachtel "continued to scuffle around on the floor and all the way around through the hall and into the kitchen, and it continued to get worse." While in the kitchen, the appellant began choking his father with both hands, and Mr. Wachtel's face turned "very red." Mrs. Wachtel grabbed a plastic tray from a nearby high chair and struck the appellant in the back of the head several times.

Eventually, the appellant got up and went out the door. Mr. Wachtel decided that he did not want the appellant to take the truck and followed the appellant outside. Later, the police arrived to investigate the 911 call. Mrs. Wachtel maintained that Mr. Wachtel did not have a weapon that night.

Mrs. Wachtel testified that her husband was fifty-nine years old at the time of the offenses and the appellant was twenty-nine years old. Mr. Wachtel died one month after the altercation.

Bruce William Busby, Jr., a friend of the appellant, testified on his behalf. Busby stated that he had visited the victims' residence approximately one week before the offenses. Initially, Amber and Sheron Wachtel had been friendly. However, when the appellant arrived, "they were bad-mouthing him

the second he walked in the door." The women made derogatory comments about the appellant being there to visit "his alleged child." Busby and the appellant left as a result of the comments.

On September 28, 2001, the appellant called Busby. Busby testified, "He was very distressed and said his father and mother had gotten in a fight and I needed to come pick him up." Twenty-five minutes later, Busby arrived at the residence. He saw the appellant sitting on the side of the road with a police officer. The appellant's shirt and clothes were covered in blood. The appellant was not wearing shoes. The appellant told Busby "that he had been in a fight with his mother, his father and Amber. The appellant stated his father had hit him in the back of the head with a gun and that his mother and Amber had scratched his face." The appellant asked Busby to go to the residence to retrieve his wallet, keys, shoes, and camera.

Busby walked up the long driveway to the residence and rang the doorbell of the home. Mr. Wachtel answered the door and acted like nothing had happened. Busby could see no signs of a struggle.

Next, the appellant testified on his own behalf. He stated that he and Amber separated in March 2001, and Amber moved in his parents home. The appellant opined that such living arrangements were "pretty dysfunctional." On September 28, 2001, he went to his parents' home to visit Taylor. When he got to the home, he took off his shoes to avoid tracking dirt into the house. He then went into the den where Amber, Taylor, and his mother were sitting. The appellant picked up Taylor and sat on an ottoman to play with the child. Mrs. Wachtel asked the appellant why he was there. She accused, "You have denounced this child, and you are no father. You are nothing but a favorite uncle, if that." Amber and Mrs. Wachtel told the appellant that he had "played right into their hands when [he] filed for divorce and [he] was never going to see [Taylor] again." The appellant maintained that their tone was "[e]xtremely derogatory, vicious and smart-aleck."

According to the appellant, he had incurred problems during previous visits. Therefore, he told the women that if he could not have a peaceful visit with the child, the visitation would have to take place elsewhere. The appellant denied threatening to take the child. He theorized that the women were angry and misunderstood him.

The appellant testified that Amber approached him "in an aggressive manner" and was "flailing her arms." The appellant stated that he put up a hand to defend himself and Taylor. The appellant testified that he did not know if he grabbed Amber's arm. He maintained, "I know that she went to the ground, and I very well could have grabbed her to keep her from hurting the child. I could [have]. It is probable."

The appellant recounted that his mother "came about the same time, and she was also taking swings and punches at me – open hand and closed fisted – at me at the same time." Mrs. Wachtel started "flailing her arms" and she lunged at the appellant's face, ripping off his glasses. The appellant stated that his mother "was talking again that I was evil and she wished I had never been born. And she was extremely aggressive, on top of me."

-8-

Eventually, the physical altercation ceased, and Mrs. Wachtel told the appellant that she was going to call his father. The appellant encouraged her to make the call. When Mr. Wachtel arrived, he asked what was happening. The appellant explained that he had come to the house to visit the child. He claimed that the two women badgered him and tried to attack him. The appellant complained that even though he spoke with his father, "I never got to explain my side."

Mr. Wachtel ordered the appellant to "[g]et the hell out of my house." The appellant stated that as he got up to get his shoes, his father cursed and kicked his back. The appellant explained that he had witnessed his father "beat people up" on previous occasions, so he turned around to defend himself. He grabbed his father's arms to prevent him from throwing punches. The two men "wrestled around" until they reached the kitchen. The appellant denied choking his father. Instead, the appellant averred that his father pinned him to a wall and grabbed his neck, screaming "that I was a silver-spoon, snot-nosed little kid; he didn't raise me to be that way." As the appellant tried to get away, his mother struck him with the tray.

After leaving the house, the appellant went halfway down the driveway, approximately 220 yards, and called Busby for help. The appellant stated that he needed to go back and get his keys, shoes, and wallet. He was particularly concerned about his wallet because it contained $1000 and his identification, and he feared that his father would destroy it. As the appellant went back toward the residence, he saw his father inside the truck. From a distance, the appellant explained why he had returned. The appellant testified that his father pulled a pistol from a holster and charged toward him, screaming, "I'm going to f***ing kill you, you little shit." When his father reached "point blank range," the appellant turned to run away. The appellant stated that he "felt a large blow to the head" and began bleeding profusely from the head. The appellant ran away and called 911 to report the shots.

The appellant maintained that although there were approximately six officers at the residence that night, no one took a statement from him. He stated that Deputy Taylor arrested him and took him to the hospital where he received eight staples to the wound in his head.

Based upon the foregoing evidence, the jury found the appellant guilty of three counts of domestic assault. The trial court sentenced the appellant to eleven months and twenty-nine days' incarceration on each count. The trial court further ordered that the sentences for counts one and two be served concurrently with each other but consecutively to count three. The court placed the appellant on probation.

On appeal, the appellant alleges that the trial court erred in its ruling regarding the admissibility of the paternity test results and the denial of a continuance or an interlocutory appeal. The appellant also raises issues regarding the sufficiency of the evidence and consecutive sentencing.

## II. Analysis

### A. Motion in Limine

On August 14, 2002, the day prior to trial, the State filed a motion in limine asking the trial court to "determine the admissibility of paternity testing done in his divorce proceeding." On August 15, 2001, immediately prior to trial, the trial court held a hearing on this motion.

At the hearing, it was alleged that the appellant and Amber were married in June 2000 and Amber gave birth to a child in December 2000. The appellant and Amber separated in March 2001 and the appellant filed for divorce in July 2001. The instant offenses occurred on September 28, 2001.

As part of the divorce proceedings, the appellant requested paternity testing to determine if he was the father of the child. The testing was completed; however, the record does not disclose when the test was performed. At the time of the assaults, the results of the paternity test were not known. However, at some point after the offenses, the paternity results revealed that the appellant was not the biological father of the child.

During the motion hearing, the State reiterated that it contested only the admissibility of the results of the test. The State did not dispute the admissibility of the appellant's request for the paternity testing, nor did it dispute that a disagreement regarding the test led to the offenses.

The appellant argued that his "entire defense is based on the existence of the paternity tests." The appellant maintained that the fact that the child was not his "shows the bias and the prejudice that these family members have against him." The appellant alleged that the results of the test also demonstrated "the fact that perhaps what they say happened did not happen, that they have a routine course of conduct for not being truthful or up front with [the appellant]." The appellant claimed that Amber knew that the child was not his, thus demonstrating her lack of truthfulness.

The trial court determined:

> I think that the problems that led up to the argument would be admissible, so obviously the fact that they were married, that he . . . on his attorney's advice asked for the paternity test and that created a problem, I certainly think that, if that was what the argument was about, then we ought to let that in. So the fact of the paternity test itself I think . . . is probably relevant and should be let in.
>
> Now, in any kind of case of this nature the conduct of the parties after the incident itself I don't let in because it simply is not relevant to what happened on the 28th day of September. There might be an ongoing course of conduct, but it is not relevant to the actual incident. . . . What led up to the incident certainly is relevant, but what happened afterwards I don't think is relevant . . . and I don't see how it could be.
>
> So the paternity test itself, the fact of the paternity test, certainly you can go into; and the fact that was a sore point and that is what the argument

-10-

was about I think is relevant. But anything that happened after the 28th of September I'm not going to allow, so we'll be limited to incidents up to then.

After the trial court's ruling, the appellant complained that "[w]e believe this is all relevant and crucial to our defense. If we are unable to present a defense that involves course of conduct, I would respectfully ask for a continuance. . . . We believe that is relevant to the state of mind of these people, to their bias, and credibility to the victims." The trial court denied the motion for a continuance because the jury had already been impaneled, and the court did not believe "anything would change if you had a continuance." In response, the appellant requested an interlocutory appeal concerning the trial court's ruling on the motion in limine. The trial court denied the request.

On appeal, the appellant vehemently complains that the trial court erred in deciding to bar testimony regarding "his reasons behind the request for the paternity test and the actual results of the paternity tests." Specifically, the appellant argues that "[a]t issue was an extra marital affair of [his] wife and the victims predisposition to antagonize [the appellant] regarding the paternity tests and especially, the witnesses credibility. The truth behind the victims actions are relevant and could be used to access their credibility." Finally, the appellant baldly contended that "this evidence is relevant and admissible under T.R.E. 401, 611, 608, and 616."[2]

Tennessee Rule of Evidence 402 provides that "[a]ll relevant evidence is admissible except as [otherwise] provided. . . . Evidence which is not relevant is not admissible." "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401; see also State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999). This court has previously observed that "[t]he question of whether evidence is admissible rests within the sound discretion of the trial court; and this Court will not interfere with the exercise of this discretion unless clear abuse appears on the face of the record." State v. Hill, 885 S.W.2d 357, 361 (Tenn. Crim. App. 1994).

In the instant case, the appellant did not dispute the fact that the results of the paternity tests were not known on September 28, 2001, the date of the offenses. The trial court found that because the results were not known to the parties until after the offenses, they were not relevant to the appellant's actions. The trial court further found that the appellant's request for the paternity test and the friction it caused in the family were relevant and permitted such testimony. We note that at trial the jury heard testimony explaining that the appellant asked for the paternity test upon the advice of counsel and that the request caused conflict between the appellant and the victims. The paternity test results could not have been a factor in determining who was the aggressor as the results were not known at the time of the offense. Moreover, the appellant's defense was that he "didn't strike anyone." Upon our examination of the

---

[2] Tennessee Rule of Evidence 401 defines relevant evidence. Rule 608 concerns the admissibility of character evidence. Rule 611 deals with the scope of direct examination and cross-examination. Finally, Rule 616 explains the impeachment of a witness due to their bias or prejudice against a party.

record, we find no fault with the ruling of the trial court deeming the contested evidence to be irrelevant under Tennessee Rule of Evidence 401. Furthermore, we can discern no reason for the admissibility of the evidence under Rules 608, 611, or 616. This issue is without merit.

## B. Continuance

Following the trial court's ruling on the motion in limine, the appellant requested a continuance, asserting that the results of the paternity test were central in presenting the appellant's defense. The trial court denied the request. On appeal, the appellant summarily argued that "the denial of the continuance and requested interlocutory appeal regarding the ruling on the late filed Motion in Limine regarding the paternity tests denied him a fair trial."

It is well-established that the decision whether to grant a continuance rests within the sound discretion of the trial court. See State v. Mann, 959 S.W.2d 503, 524 (Tenn. 1997). The trial court's decision may only be reversed if the trial court abused its discretion and the appellant was improperly prejudiced. See State v. Morgan, 825 S.W.2d 113, 117 (Tenn. Crim. App. 1991). An appellant is improperly prejudiced by the denial of a motion for continuance when "a different result might reasonably have been reached if the continuance had been granted." Id.

In the instant case, the trial court stated, "I'm not going to grant a continuance. We have a jury in here, and I don't see how anything would change if you had a continuance. I mean, the fact of the matter is we are here on the incident of the 28th of September." We conclude that the trial court's ruling did not constitute an abuse of discretion. Additionally, the appellant has made no argument concerning any potential prejudice he suffered because of the denial of the request for a continuance. Based upon our review of the record, we conclude that there is no indication that a continuance would have reasonably led to a different result. This issue is also without merit.

## C. Interlocutory Appeal

As we earlier noted, the appellant summarily stated that the trial court's denial of an interlocutory appeal denied him a fair trial. The appellant made no argument or cited any authority regarding this issue. See Tenn. R. App. P. 9 (providing the rules and procedures to be followed in interlocutory appeals). Thereby, we are precluded from addressing the appellant's concerns, and we deem this issue waived. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); Tenn. R. App. P. 27(a)(7) (mandating that the appellant's brief shall contain an argument regarding the issues and why the issues warrant relief).

## D. Sufficiency of the Evidence

In a convoluted fashion, the appellant challenges the sufficiency of the evidence supporting his convictions. On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why

the evidence will not support the jury's findings.  See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).  The appellant must establish that no "reasonable trier of fact" could have found the essential elements of the offense beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom.  See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983).  In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts.  See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The appellant was found guilty of three counts of domestic assault.  Count one related to the appellant's assault of his mother; count two related to his assault of his wife; and count three referred to his assault of his father.  "A person commits domestic assault who commits assault as defined in § 39-13-101 against a person who is that person's family or household member."  Tenn. Code Ann. § 39-13-111(b) (Supp. 2001).[3]  The statute proscribing domestic assault defines a family or household member as a "spouse, former spouse, person related by blood or marriage, or a person who currently resides or in the past has resided with that person as if a family. . . ."  Id. at (a).  Assault occurs when a person "[i]ntentionally, knowingly or recklessly causes bodily injury to another."  Tenn. Code Ann. § 39-13-101(a) (1) (1997).  "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement; physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty."  Tenn. Code Ann. § 39-11-106(a) (2) (1997).

In the instant case, it was uncontroverted that Amber Wachtel was married to the appellant at the time of the offenses, and that Sheron and David Wachtel were the appellant's parents.  Thus, the proof demonstrated that the victims were the appellant's "family or household members."  Next, we must determine if the proof adduced at trial demonstrated that the appellant assaulted the victims.

The victim's wife testified that when the victim's mother approached the appellant to obtain Taylor, the appellant "swatted at [SheronWachtel] and scratched her arm or something."  Amber noticed a scratch on Mrs. Wachtel's arm after the altercation with the appellant.  Mrs. Wachtel testified that the appellant "tried to slap his hands at my arms to keep them away from him" and the slaps "caused some scratches and bruises."  Furthermore, Captain Badacour testified that during his interview of Mrs. Wachtel, he observed scratches on her arm.  Taking the evidence, as we must, in the light most favorable to the State, this testimony supports the appellant's conviction on count one.

Amber and Sheron Wachtel both testified that the appellant grabbed Amber's arm and twisted it.  Mrs. Wachtel recalled that Amber cried out in pain, and Amber testified that the twisting of her arm hurt and forced her to her knees.  Moreover, the appellant acknowledged that it was "probable" that he twisted Amber's arm.  Additionally, Captain Badacour testified that he noticed that Amber had a scratch

---

[3] This code section became effective on July 1, 2000.  See Tenn. Code Ann. § 39-13-111(b) (Supp. 2001).

on her arm where she said the appellant grabbed her. We conclude that this testimony is sufficient to uphold the appellant's conviction on count two.

Finally, both Amber Wachtel and Sheron Wachtel testified that the appellant and his father engaged in a lengthy brawl which progressed from the living room of the residence into the kitchen. Both women asserted that the appellant repeatedly punched his father. Amber stated that the appellant's father had a "black eye" from the altercation, but she could not recall the precise moment when the injury occurred. Amber and Sheron Wachtel recalled that during the fight in the kitchen, the appellant was on top of his father and had both hands around his neck, choking him. Both women stated that Mr. Wachtel's face became very red when the appellant was choking him. Sheron Wachtel specifically maintained that her husband could not breathe at the time. Furthermore, upon his arrival to the residence, Captain Badacour saw that Mr. Wachtel's face was red and bruised and there was some swelling to his head. We conclude that there is sufficient evidence to support the appellant's conviction on count three.

## E. Sentencing

Finally, the appellant argued that the trial court erred in imposing consecutive sentences. Regrettably, the appellant failed to include the sentencing transcript in the appellate record for our review. See Tenn. R. App. P. 24(b) (stating that for an appeal "the appellant shall have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal."). This court has previously cautioned, "In the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence." State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). Accordingly, as we are unable to review the appellant's contentions, we must presume that the trial court was correct in imposing consecutive sentences.

## III.  Conclusion

Finding no error, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE

-14-